J-S41031-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: V.F., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.F.G. | |
| | No. 173 MDA 2015 |

Appeal from the Decree December 23, 2014
in the Court of Common Pleas of Northumberland County
Orphans' Court at No.: Adoptee No. 25 of 2014

| | |
|---|---|
| IN RE: ADOPTION OF: C.F., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.F.G. | |
| | No. 174 MDA 2015 |

Appeal from the Decree December 23, 2014
in the Court of Common Pleas of Northumberland County
Orphans' Court at No.: Adoptee No. 24 of 2014

BEFORE: ALLEN, J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED AUGUST 11, 2015**

---

[*] Retired Senior Judge assigned to the Superior Court.

In these consolidated appeals[1], M.F.G. (Mother) appeals the decrees of the Court of Common Pleas of Northumberland County, entered December 23, 2014, that terminated her parental rights to her daughter, V.F., born in October of 2002, and her son, C.F., born in October of 2005 (Children), and changed their goals to adoption.[2]  We affirm.[3]

Northumberland County Children and Youth Services (NCCYS) originally removed the Children from Mother's care and custody, and placed them in foster care pursuant to a voluntary entrustment agreement she signed on May 2, 2013, after a Child Protective Services (CPS) report alleged emotional abuse of the Children.  The trial court adjudicated the Children dependent on July 11, 2013, and ordered that they were to remain in the legal and physical custody of NCCYS.

Mother has a history with NCCYS dating from 2006 when she returned to Pennsylvania after having lived in Maryland, Texas, and Florida.  While in Texas, she became involved with Texas Child Protective Services (TCPS) and, in Florida, with Brevard County Children and Youth Services.  TCPS placed V.F. in foster care for a time while the family was living in Texas and

---

[1] This Court consolidated the appeals *sua sponte* on February 20, 2015.

[2]  Mother gave birth to another child, I.R., in 2009.  I.R. is currently in the custody of his father and is not a subject of this appeal.

[3] The Children's father, K.F., relinquished his parental rights voluntarily in a decree entered August 14, 2014.

Mother, for a time, relinquished custody of V.F. to her mother, the Children's maternal grandmother.

NCCYS received several referrals regarding the Children between 2006 and 2013. These referrals led it to address a lack of independent housing, the poor condition of the home, behavioral concerns regarding the Children, and inappropriate discipline.

Mother met her current husband, S.G., in 2010 while attending school. He began living with Mother and the Children shortly thereafter. The referrals escalated once he moved in and NCCYS began offering services to the family at that time.

Just prior to the current placement, on July 6, 2012, NCCYS received a referral alleging inappropriate discipline by a caregiver. Although the initial referral was marked as unfounded, concerns were noted at that time regarding discipline techniques being used by Mother and S.G. which were referred to as "excessive" and "boot camp style" by the caseworker. (N.T. 8/14/14, at 15). The caseworker observed C.F., who was six at the time, writing out the United States Constitution as a punishment. In addition to excessive writing-out exercises, Mother and S.G. punished the Children by assigning push-ups, sit-ups, sitting against the wall, and holding arms out level for lengths of time. (*See id.* at 15, 24). The caseworker visited the home some thirty to thirty-five times in the next months, "[a]nd during that time [she] found [the Children] writing assignments continuously, almost every visit except for one or two." (*Id.* at 15). At a later visit, the

caseworker observed that cameras had been installed in every room except the bathroom. (*See id.* at 18). Mother provided the caseworker with a written document, prepared by herself and S.G., consisting of five pages of rules, punishments, and rewards that they had established for the Children. Mother told the caseworker that she felt the rules were appropriate. (*See id.* at 21-22).

On April 3, 2013, NCCYS received a referral alleging poor conditions in the home and that Mother and S.G. had shaved V.F.'s head. NCCYS confirmed these allegations. (*See id.* at 43-44). NCCYS removed the Children from the home on May 2, 2013, after it received referrals alleging emotional abuse of the Children. The allegations were that V.F. appeared depressed, had her head shaved, and was the recipient of excessive discipline. (*See id.* at 47). The referral also alleged that C.F. was depressed and was exhibiting aggressive behaviors that included cruelty to animals and starting fires. (*See id.*). After an investigation, the allegations were marked "indicated" as to both Mother and S.G. (*Id.* at 49; *see also* NCCYS Exhibit 4). As part of the investigation, Pamela McCloskey, M.Ed., a licensed psychologist, conducted a psychological evaluation and concluded that Mother and S.G. had emotionally abused the Children. (*See* NCCYS Exhibit 3).

NCCYS filed dependency petitions on May 31, 2013. The trial court adjudicated the Children dependent on July 12, 2013, ordered them to remain in the legal and physical custody of NCCYS, and ordered supervised

visitation with Mother and S.G., both of whom were to obtain psychological evaluations and follow any recommendations. Mother was to maintain safe and stable housing, and obtain employment sufficient to provide financial stability. The trial court ordered Mother and S.G. to complete an intake at the Northumberland County Family Center and follow through with all recommended classes.

At a permanency review hearing on April 10, 2014, the trial court ordered that the Children were to remain in the legal and physical custody of NCCYS. The trial court found that Mother had not complied with the permanency plan and had made no progress toward alleviating the conditions that necessitated placement. Mother had begun parenting classes, but had obtained neither financial stability nor stable housing, and had not completed the ordered psychological evaluation.

NCCYS filed petitions for the involuntary termination of Mother's parental rights to the Children on June 17, 2014. The trial court held hearings on those petitions on August 14, 2014, November 3, 2014, and December 22, 2014, and entered its decrees terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (b), on December 23, 2014. Mother filed her notices of appeal and statements of

errors complained of on appeal on January 20, 2015. *See* Pa.R.A.P. 1925(a)(2)(i).[4]

Mother raises the following questions on appeal:

I. Whether the trial court erred in determining that [NCCYS] presented clear and convincing evidence that grounds for involuntary termination exist?

II. Whether the trial court erred in determining that the best interests of the [C]hild[ren] would be served by terminating parental rights?

(Mother's Brief, at 10) (most capitalization omitted).

Our standard of review is as follows:

. . . In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard

_____

[4] The trial court filed a Rule 1925(a) opinion on March 18, 2015. *See* Pa.R.A.P. 1925(a).

for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

We note our standard of review for a change of goal:

When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion. In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. . . .

*In re S.G.*, 922 A.2d 943, 946 (Pa. Super. 2007) (citation omitted).

In order to affirm the termination of parental rights, this Court need only agree with any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition

either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*     \*     \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citation and internal quotation marks omitted). Further,

[a] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

To terminate parental rights pursuant to section 2511(a)(1), the person or agency seeking termination must demonstrate, through clear and convincing evidence that, "for a period of at least six months prior to the filing of the petition, the parent's conduct demonstrates a settled purpose to relinquish parental rights or that the parent has refused or failed to perform parental duties." **See In re Adoption of M.E.P.**, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).

With respect to subsection 2511(a)(1), our Supreme Court has held:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

**Matter of Adoption of Charles E.D.M.**, **II**, 708 A.2d 88, 92 (Pa. 1988) (case citation omitted). Further,

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

**In re B.,N.M.**, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (citations omitted).

The Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and

- 9 -

welfare of the child." 23 Pa.C.S.A. § 2511(b). The Act does not make specific reference to an evaluation of the bond between parent and child but our case law requires the evaluation of any such bond. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). However, this Court has held that the trial court is not required by statute or precedent to order a formal bonding evaluation performed by an expert. *See In re K.K.R.-S*., 958 A.2d 529, 533 (Pa. Super. 2008).

We have chosen to analyze Mother's first issue pursuant to 23 Pa.C.S.A. § 2511(a)(1). *See B.L.W.*, *supra* at 384. In her brief, Mother argues that the trial court erred in terminating her parental rights pursuant to subsection (a)(1) in that:

> In addition to visitation, Mother had taken other steps to remedy her situation. Mother had completed some of the parenting classes, which were ordered by the [c]ourt. Additionally, she and [S.G.] met with a family resource worker to cover the classes she did not complete. Finally, Mother purchased a home. Mother has limited means, so this home was condemned when she bought it. Mother and [S.G.] worked steadily on the home while the [C]hildren were in care, and by the time of the last hearing, the electricity was about to be turned on, and the code officer was soon going to inspect it. Mother was remedying the conditions that led to placement.

(Mother's Brief, at 18).

This may be true, but the record demonstrates that it all came too late. As the trial court correctly observed:

> The Petition for Termination of Parental Rights was filed on June 17, 2014. A review of the Permanency Review order entered during the six months immediately preceding this date reveals that Natural Mother had failed to perform parental

- 10 -

duties, as she provided no housing or financial support for either of the Minor Children during this time period. Natural Mother was intermittently employed and did not have independent housing during this time period. Although she and S.G. had purchased a home in a judicial sale, the home was subsequently condemned and remained officially condemned as recently as the final day of testimony on [NCCYS'] Petition for Termination of Parental Rights. Mother failed to undergo the ordered psychological examination until May of 2014, one month prior to the filing of the Termination Petition.

(Trial Court Opinion, 3/18/15, at 5) (record citations omitted). Mother clearly refused or failed to perform her parental duties. Mother's first issue is without merit.

In her second issue, Mother argues that the termination of her parental rights would not be in the Children's best interest because there is a bond between them and the termination of her parental rights would have a negative effect on the Children:

A bonding assessment was performed by Dr. Kasey Shienvold. Dr. Shienvold concluded that there was indeed a strong bond between Mother and the [C]hildren. This bond was stronger between Mother and C.F. than it was with V.F. C.F. has always been adamant that he wanted to return to Mother, and, at the time of the assessment, was angry that he was unable to return to her care. Dr. Shienvold stated that the bond between Mother and the [C]hildren was unhealthy. However, Dr. Shienvold believed that a termination of parental rights would have a negative effect on the [C]hildren, in that they would have to undergo therapy in order to deal with it. If these [C]hildren will have to undergo therapy to deal with the loss of their [M]other, then a termination of their relationship with her cannot be in their best interest.

(Mother's Brief, at 20).

We disagree. A careful examination of the record reveals that the termination of Mother's parental rights will benefit the Children. We quote the trial court, with approval, on this complicated issue:

Here, the [c]ourt examined the existence and quality of the bond between [Mother] and the [Children], and a bonding assessment was completed by Dr. Kasey Shienvold on September 15, 2014. [V.F.] indicated during this assessment that she feels a greater level of comfort in her foster home, although it is also reported that she continues to engage in self-soothing behaviors at times. V.F. misses [Mother] and her grandmother, however she did not evince a strong desire to return to [Mother's] home. C.F., on the other hand, is very "resolute and adamant" that he should be living with [Mother], although he also speaks very positively of his current placement as well. (N.T. Termination Hearing, 11/03/14, at 87).

Dr. Shienvold concluded that, ". . . there [] certainly [is] an attachment between [the Children] and [Mother]." (**Id.** at 94). He further observed that the attachment between V.F. and [Mother] was much weaker than the attachment between C.F. and [Mother].

Having acknowledged the existence of a bond, the [c]ourt must then turn to assess the quality of that bond in determining whether termination would serve the best interests of the [Children]. As to V.F., the [c]ourt believes that the bond between [M]other and [C]hild is not a strong one, nor is it a healthy one. V.F. continues to exhibit symptoms of guilt for circumstances beyond her control, and the [c]ourt does not believe that she feels safe or cared for by [Mother]. In regard to C.F., the [c]ourt believes that while this [M]other-child bond is significantly stronger, it is decidedly not healthy.

Dr. Shienvold noted that an unhealthy yet strong attachment between parent and child is not uncommon, and he characterized the bond between C.F. and [Mother] as just such a bond. He stressed that continued attachment such as this would result in C.F. learning ". . . unhealthy attachments, the child learns very maladaptive behaviors, interpersonal relationship styles, conflict resolution strategies, and discipline techniques. In unhealthy relationships, unfortunately those things become

reinforced and passed on." (*Id.* at 98). Further, considering the emotional abuse perpetrated by [Mother] and S.G. upon the [Children] and the resultant trauma, particularly as to V.F., retaining the parent-child bond and re-exposing [the Children] to their abuser could in fact do even further damage than has already occurred.

Dr. Shienvold predicted that termination of parental rights would result in emotional fallout for both [Children], which would likely manifest for V.F. in the form of internalizing behaviors and for C.F. in the form of behavioral issues. This [c]ourt agrees. However, balancing that emotional fallout (which, if intervention is required, can be addressed by the appropriate professionals in a setting in which the [C]hildren feel safe and secure) against the continued emotional abuse which would be a virtual certainty upon any return to [Mother's] care now or in the future, the [c]ourt believes that termination of [Mother's] parental rights best serves the best interests of [the Children].

(Trial Ct. Op., at 10-11) (some record citations omitted; record citation formatting provided).

Our Supreme Court has stated that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation omitted). It further observed that "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *Id.* (citation omitted). Thus, we will not disturb the trial court's decision. *See In re L.M.*, *supra* at 511.

- 13 -

Here, terminating Mother's parental rights will benefit the Children by severing the unhealthy bond between her and the Children, and permitting them, through appropriate therapy, to learn how to develop healthy bonds and relationships with others. Mother's second issue is without merit.

Accordingly, for the reasons stated, we affirm the decrees of the Court of Common Pleas of Northumberland County that terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1) and (b), and changed the Children's goals to adoption.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/11/2015